UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : Criminal No. 12-129 (CKK) |
| THOMAS W. GORE, | : |
| Defendant. | : |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. Thomas W. Gore ("Gore" or "defendant") used his position as assistant treasurer of the District of Columbia mayoral campaign of Candidate A to help funnel money illegally from that campaign to the campaign of Candidate B, and then he destroyed the record of these payments and lied about it when questioned by federal law enforcement agents. For the reasons stated below, the government respectfully recommends that the Court sentence defendant to a six-month period of incarceration, followed by a term of supervised release that includes a six-month period of home detention and certain conditions, including that Gore shall perform 400 hours of community service and shall not participate in any political campaign without the prior written approval of the probation department.

I. **Background**

Gore worked on the 2010 Candidate A for Mayor campaign ("Campaign A"). He held the position of assistant treasurer for the campaign, handled the day-to-day finances of the campaign, and was a member of the campaign's treasury team. He previously had served as treasurer of Candidate A's 2004 campaign for Ward 7 Council Member and 2006 campaign for Chairman of the Council of the District of Columbia ("D.C. Council"). Beginning in or around late June 2010, Gore helped carry out a plan to divert funds from Campaign A to the campaign of minor mayoral Candidate B. The purpose of these payments was to keep Candidate B in the mayoral race so that he could continue to verbally attack then-Mayor Adrian Fenty at candidate debates and other forums. On several occasions, as part of this plan, Gore provided Howard Brooks ("Brooks"),[1] a Campaign A worker and a member of the campaign's finance and treasury teams, with money orders that had been purchased with excessive (i.e., in excess of the individual contribution limit and/or the cash contribution limit under the local campaign finance laws) or unattributed (i.e., unable to be tied to a particular donor(s)) cash contributions to Campaign A.[2] Brooks filled in the names and addresses of real persons, who had not contributed these funds, as the purported contributors of these money orders. Brooks personally delivered some of these money orders to Candidate B after writing "[Candidate B] for Mayor" on the payee line. Gore kept a record of the funds that were provided to Candidate B by Campaign A by writing in a spiral notebook the amounts provided.

---

[1] Brooks pleaded guilty before this Court on May 24, 2012, to one count of Making a False Statement, in violation of 18 U.S.C. § 1001. On October 10, 2012, this Court granted the government's motion for a downward departure based on substantial assistance to the government in its investigation and sentenced Brooks to a 24-month term of probation, with the special conditions that Brooks shall perform 200 hours of community service and shall not

Shortly after allegations by Candidate B against Campaign A appeared in the media, Gore made the deliberate choice to shred the spiral notebook in which he had kept a record of payments to Candidate B by Campaign A. Gore did this in order to prevent law enforcement from finding out about this diversion of funds which Gore knew to be illegal. Furthermore, when confronted by the Federal Bureau of Investigation ("FBI") about his record of payments to Candidate B by Campaign A, Gore gave false statements to the FBI to hide his conduct. After receiving a Grand Jury subpoena on October 5, 2011, Gore and his lawyer appeared voluntarily at the United States Attorney's Office in the District of Columbia on October 13, 2011, for an interview with three FBI agents and others. Gore was clearly aware of the ongoing Grand Jury investigation, but he was not aware that a conversation he had with Brooks in September 2011, had been shared with the FBI. During the October 13, 2011 interview, the agents asked Gore several questions about his record of payments to Candidate B by Campaign A. In response, Gore made at least three false statements: (i) Gore stated that he and Brooks had not discussed records of anything provided to Candidate B, when, in fact, as Gore well knew, he had told Brooks that he used to keep a record of payments to Candidate B by Campaign A and that he shredded this record when the media first reported Candidate B's allegations; (ii) Gore stated that

---

participate in any political campaign without the prior written approval of the probation department.

In his Statement of the Offense, in addition to admitting his role in making payments to Candidate B, Brooks also admitted that he used money orders which he received from Gore to make fraudulent contributions of $2,000 to Campaign A in his own name and in the name of a friend. Brooks acknowledged that neither he nor his friend had contributed any money toward the purchase of these money orders.

[2] Under the local campaign finance laws, such contributions are supposed to be returned rather than deposited and used by the campaign.

3

he never maintained records of anything given to Candidate B, when, in fact, as he well knew, he had maintained a record of payments to Candidate B by Campaign A and shredded this record when he heard the media's first reports of Candidate B's allegations, and (iii) Gore stated that although he did maintain a spiral notebook containing a record of the money that was given to Candidate B, he shredded that notebook about a week after the general election, when, in reality, Gore shredded the notebook when media reports of Candidate B's allegations first came out in March 2011.

On May 21, 2012, a four-count Information was filed against Gore in the United States District Court for the District of Columbia. Gore pleaded guilty before this Court on May 22, 2012, to three counts of Making a Contribution in the Name of Another Person, Aiding and Abetting, in violation of D.C. Law 11-144, D.C. Official Code §§ 1-1131.01(e), 22-1805, and one count of Destruction of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519. As part of his plea agreement, Gore agreed to cooperate with the government. Sentencing is scheduled for July 26, 2013, at 9:30 a.m.

II. **A Sentence of Six Months of Incarceration Followed by Six Months of Home Detention is Appropriate Based on the Sentencing Guidelines Calculation.**

The parties have stipulated that the defendant's offense level is 13 under the voluntary Sentencing Guidelines. That level calls for a sentence of 12 to 18 months of incarceration, although the minimum term may be satisfied by, inter alia, substituting home detention for up to one-half of the minimum term (U.S.S.G. § 5C1.1(d)). Under the plea agreement, the parties have agreed that "a sentence within the Stipulated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a)." Plea Agreement, Dkt. No. 6, ¶ 10.

III.   **The Section 3553(a) Factors Support a Sentence of Six Months of Incarceration Followed by Six Months of Home Detention.**

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." United States v. Gall, 552 U.S. 38, 49 (2007) (citation omitted). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," id. at 46, and are the "starting point and the initial benchmark," id. at 49. The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).[3] Id. at 49-50. As discussed below, a consideration of these factors favors a sentence consistent with the bottom of the Stipulated Guidelines Range set forth in the parties' plea agreement.

   A.   Nature and Circumstances of the Offense and Its Seriousness

Gore's conduct in this case was extremely serious. He repeatedly abused his position as assistant treasurer of Campaign A by secretly providing Brooks with money orders, which Gore knew had been purchased with unlawful contributions to Campaign A, to give to Candidate B. His participation in making fraudulent contributions to Campaign B (as well as to Campaign A; see n.1, supra), caused significant damage to the image and integrity of the District's electoral

---

[3] Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the offense as set forth in Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

process. To promote transparency in the electoral process, the D.C. campaign finance laws prohibit a person from making a contribution in the name of another person and prohibit a campaign from accepting excessive and/or unattributed cash contributions. See D.C. Official Code §§ 1-1163.07(5) (previously 1-1102.01(b)), 1-1163.33(c), (e) (previously 1-1131.01(c), (e)). To deter abuses and instill public confidence in the electoral process, the D.C. Office of Campaign Finance ("OCF") of the Board of Elections and Ethics is responsible for gathering and publicly disclosing information concerning, inter alia, the amounts and sources of political contributions to local candidates and their political committees. It is axiomatic that the information disclosed by OCF is only as reliable as the information reported to OCF by local candidates and their campaign committees.

The criminal schemes in which Gore participated undermined one of the primary goals of the local campaign finance laws: transparency. By converting excessive and unattributed cash contributions to Campaign A into money orders and redirecting those funds to Candidate B through Brooks, Gore actively impeded OCF in its information-gathering and disclosure functions. It was the intent of Gore and his co-conspirators to conceal from OCF the fact that Campaign A was the true source of certain funds received by Campaign B. Through their actions, Gore and his co-conspirators knowingly caused both Campaign A and Campaign B to file false reports with OCF. Campaign A's reports omitted the unlawful receipt of certain funds and their transfer to Campaign B. Campaign B's reports falsely stated that the individuals whose

names appeared on certain money orders as purported purchasers had made contributions to Campaign B, when, in fact, these contributions to Campaign B were made by Campaign A.[4]

These criminal schemes were aimed at advancing Candidate A's candidacy for mayor without any regard for the integrity of the electoral process. Gore deliberately clouded a campaign finance disclosure process that is intended to be transparent. The residents of the District of Columbia were entitled to know that funds were being illegally diverted from Campaign A to Campaign B, as well as illegally accepted and used by Campaign A. But Gore and his co-conspirators ensured that no such information reached the voting public prior to the election.

Gore's crimes are made more egregious by the fact that Gore was well aware of the dictates of the local campaign finance laws and knowingly chose to violate them. He had previously served as the official treasurer of Candidate A's 2004 and 2006 campaigns, and, as such, he had received training from OCF in the local campaign finance rules and regulations. As an experienced campaign treasurer, he should have had a heightened appreciation for the importance of following the local campaign finance rules and ensuring the accurate reporting of contribution information to OCF. He also should have been well aware of the critical elements

---

[4] Similarly, by purchasing money orders using excessive or unattributed cash contributions to Campaign A, providing some of those money orders to Brooks and others, causing the writing of false donor names (including Brooks' own name), as well as excessive cash contributor names, on such money orders, and depositing these money orders into Campaign A's bank account, Gore and his co-conspirators put a veneer of legitimacy on contributions that Campaign A was not permitted to retain and use under the local campaign finance laws. For example, Gore and his co-conspirators knowingly caused Campaign A to file reports with OCF that falsely stated that Brooks and his friend had each contributed $2,000 to Campaign A, when, in fact, neither Brooks nor his friend had contributed any money toward the purchase of the money orders on which Brooks wrote their names.

of trust and ethics inherent in his position. Against this backdrop, his blatant disregard for the campaign finance rules supports the imposition of a significant penalty.

Gore's wrongdoing did not stop with his campaign finance violations. In March 2011, when news emerged of Candidate B's allegations against Campaign A, including the receipt of funds from Campaign A to support Candidate B's campaign, and of the FBI and U.S. Attorney's Office assessing these allegations, Gore engaged in a calculated attempt to avoid investigation and prosecution. He destroyed the only record he had of payments from Campaign A to Candidate B. He did so in the hope that destroying this record would thwart the government's investigation into financial improprieties by Campaign A, and, indeed, he might have succeeded but for his admissions to Brooks that he had kept a record of payments to Candidate B and destroyed it when the media first reported Candidate B's allegations.

Gore's wrongdoing did not stop there. When the FBI requested a voluntary interview of Gore as part of its investigation of Candidate B's allegations against Campaign A in the spring of 2011, and again in October 2011, Gore could have told the truth, even if doing so put him at risk for criminal prosecution, personal embarrassment, or both. Instead, Gore chose to mislead, obfuscate, and outright lie. In April 2011, he feigned ignorance of any payments to Candidate B by anyone involved in Campaign A and concealed his own personal involvement in response to general questions about Campaign A. In October 2011, in response to specific questions based on his admissions to Brooks, Gore stuck by his lies, hoping that he would be able to continue to conceal the unreported diversion of funds from Campaign A to Campaign B. Gore deliberately and repeatedly lied about, <u>inter alia</u>, whether he had kept a record of payments to Candidate B during the 2010 campaign and destroyed that record upon hearing media reports of Candidate

B's allegations. His false and misleading statements to the FBI required the government to expend substantial time and resources attempting to determine through other means whether Campaign A had made any payments to Candidate B. In addition, Gore's false statements corrupted and hindered the truth-seeking process of our judicial system. See generally United States v. Mandujano, 425 U.S. 564, 576 (1975) ("Congress had made [perjury] a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it."); see also Nix v. Whiteside, 475 U.S. 157, 185 (1986) ("This Court long ago noted: 'All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth . . . .'") (quoting In re Michael, 326 U.S. 224, 227 (1945)).

B.  Gore's History and Characteristics

Despite the serious nature of his crimes, Gore's history and characteristics, taken as a whole, suggest that a sentence at the bottom of the Stipulated Guidelines range is appropriate. Gore will be 58 years old at the time of sentencing and has no prior serious criminal record. (PSR ¶¶ 50-51.) He has resided in the same home in Southeast, Washington, D.C., since 1994, and is in a committed relationship with a pastor of a church in the same quadrant of the city. (PSR ¶¶ 60, 62.) He also maintains close relationships with all of his living siblings. (PSR ¶ 63.) Gore was one of seven children of unmarried parents and spent time in foster care beginning at the age of 12. (PSR ¶¶ 54-59.) Despite these early challenges, Gore completed high school and went on to earn a Bachelor's degree from Morgan State University and a Master's degree in Social Work from Howard University. (PSR ¶¶ 71-72.) He has worked mainly for non-profit social service organizations, usually in leadership positions, and engages in

additional civic involvement through his church, the Masons, and other organizations. (PSR ¶¶ 73-84.)

To Gore's credit, he eventually took responsibility for his above-described illegal activity. Furthermore, by entering a plea of guilty, he has eliminated the need for an indictment and trial and thereby helped conserve government resources. The government has taken into account Gore's willingness to plead guilty and his history of service to the community, especially to families and youth, in fashioning its sentencing recommendation.

### C. The Need to Promote Respect for the Law and Deter Similar Criminal Conduct

Given Gore's admission of guilt and his lack of any prior criminal history other than traffic offenses, it is unlikely that he will commit additional crimes in the future. This reduces the need for specific deterrence of Gore through imposition of a harsher sentence than the government is recommending. On the other hand, the sentence imposed upon Gore must reflect the importance that our electoral system places on transparency and playing by the rules and that our judicial system places on preservation of evidence and full disclosure in criminal investigations. The sentence also must ensure that individuals who take on the important responsibility of serving as treasurer for a political campaign in the future are not tempted to follow Gore's corrupt path.

Gore expressed to the Presentence Report writer that he engaged in the aforementioned criminal conduct in the interest of helping a long-term friend who was running for office. (PSR ¶ 35.) In addition, another friend of Gore's explained his criminal conduct by stating that Gore had "lost himself in loyalty" to a friend. (PSR ¶ 63a.) This theory that Gore participated in criminal activity out of an abundance of loyalty is unsatisfactory, especially given the

descriptions of Gore by those close to him as "very honest," "above reproach," and a "model human being." (PSR ¶¶ 61, 63a.) An expression of true loyalty, by such a person as Gore is described to be, would have involved putting an end to the campaign's illegal conduct before it started, rather than facilitating it. Preserving the integrity of Candidate A's campaign and saving the campaign from the shame of future, scandalous revelations would have been a far better way for a person in Gore's position to demonstrate loyalty to his longtime friend. Only a sentence that includes six months of incarceration will get across the message that the ends do not justify the means, and that no candidate's success, regardless of his individual merits, should ever be ensured through the subversion of our electoral and judicial systems.

    D.    <u>Other Sentencing Factors</u>

A sentence at the bottom of the Stipulated Guidelines range would be consistent with the other Section 3553(a) factors. Because the government's recommendation is within Gore's Stipulated Guidelines range, it is in the "heartland" of sentences imposed for this particular offense and therefore accomplishes the goal of avoiding unwarranted sentence disparities. <u>See</u> U.S.S.G. ch. 1, pt. A, cmnt. 4(b). Unlike many of the defendants who appear before this Court, Gore has little need for the sentence to provide him educational or vocational training. Similarly, he has no unusual health conditions that merit special treatment.

## IV. Conclusion

Gore misused his position as assistant treasurer of Campaign A by participating in criminal schemes that aimed to corruptly advantage the candidacy of Candidate A for mayor. Gore knowingly circumvented the local campaign finance laws and concealed such wrongdoing from OCF and the residents of the District of Columbia. He deliberately destroyed a record of illicit payments from Campaign A to Campaign B that could have aided the federal investigation into Candidate B's allegations. When questioned by the FBI, Gore lied repeatedly about his involvement in these schemes. But eventually, Gore took responsibility for his crimes. For the foregoing reasons, the government respectfully recommends a sentence of six months of incarceration followed by a term of supervised release that includes a six-month period of home detention and certain conditions, including that Gore shall perform 400 hours of community service and shall not participate in any political campaign without the prior written approval of the probation department.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

By: *(signature)*
ELLEN CHUBIN EPSTEIN
D.C. Bar No. 442861
Assistant United States Attorney
Fraud & Public Corruption Section
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7861
Ellen.Chubin@usdoj.gov